# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

ALAN SNYDER,

                 Plaintiff,

vs.

KILOLO KIJAKAZI,
ACTING COMMISSIONER OF
SOCIAL SECURITY,

                 Defendant.

No. 1:21-CV-00103-LRR

**ORDER**

---

*I.*      *INTRODUCTION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*II.*    *RELEVANT PROCEDURAL BACKGROUND.* . . . . . . . . . . . . . . . . *2*

*III.*   *ALJ's FINDINGS.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*

*IV.*   *STANDARD OF REVIEW.* . . . . . . . . . . . . .. . . . . . . . . . . . . . . . *5*

*V.*    *RELEVANT FACTUAL BACKGROUND.* . . . . . . . . . . . . . . . . . . . . . . . *7*

*VI.*   *ANALYSIS.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*

*Issues Raised by Plaintiff* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*

    *1.*      *Whether the ALJ Failed to Follow the Law of the Case and this Court's Remand Order.* . . . . . . . . . . . . . . . . . . . . . . . . . *9*

    *2.*      *Whether the ALJ Properly Considered Snyder's Subjective Complaints* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *13*

    *3.*      *Whether the ALJ Provided Good Reasons for the Weight Afforded Dr. Schroder's Opinions.* . . . . . . . . . . . . . .. . . . . . . . . . . . . . . *18*

    *4.*      *Whether the ALJ Erred by Not Fully and Fairly Developing the Record.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *23*

    *5.*      *Whether the ALJ That Decided Snyder's Claim was Properly Appointed by Acting Commissioner Berryhill During Berryhill's Second Term as*

    *Acting Commissioner.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*27*

**V.**  **CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*42*

## I.  INTRODUCTION

The matter before the court is the Complaint (docket no. 1) filed by Plaintiff Alan Snyder ("Snyder"), requesting judicial review of the Social Security Commissioner's ("Commissioner") decision to deny his application for Title II disability insurance benefits ("DIB") under 42 U.S.C. §§ 401-434. Snyder asks that the court reverse the decision of the Commissioner and order the Commissioner to provide him disability insurance. In the alternative, Snyder requests that the court remand this matter for further proceedings.

## II.  RELEVANT PROCEDURAL BACKGROUND

On March 27, 2016, Snyder protectively filed an application for DIB[1], alleging disability due to primary insomnia and a cognitive disability or mild cognitive impairment. Administrative Record ("R") at 200-201, 235. Snyder states that he became disabled on May 16, 2014. R at 235. His application was denied upon initial review and on reconsideration. R at 120-123, 126-129. On October 15, 2018, Snyder appeared with his attorney for a hearing before Administrative Law Judge Michael Comisky ("ALJ Comisky"). R at 50-81. In a decision dated November 13, 2018, ALJ Comisky denied Snyder's claim. R at 12-32. On January 15, 2019, Snyder appealed ALJ Comisky's decision, and the Appeals Council denied review on October 1, 2019. R at 1-6, 197-199. On December 5, 2019, Snyder filed suit in this court.[2] R at 1164-1168. On February 11, 2021, the court issued a decision adopting the Report and Recommendation of Magistrate Judge Mark A. Roberts to remand the case for further

---

[1] Snyder also filed a claim for Supplemental Security Income under Title XVI of the Act, but the SSI claim was denied due to his spouse's assets and was not appealed. R at 112-118, 202-203.

[2] *See* Snyder v. Commissioner of Social Security, 1:19-cv-00134-LRR-MAR.

2

proceedings.  R at 1444-1485.  Pursuant to the court's order, the Appeals Council remanded the case for a new hearing on March 1, 2021.  R at 1487-1491.

On June 6, 2021, Snyder appeared with his attorney for an administrative hearing via video conference before ALJ Matthew Gordon (the "ALJ").  R at 1378-1412.  In a decision dated June 16, 2021, the ALJ denied Snyder' claim.  R at 1350-1377.

On October 18, 2021, Snyder filed the instant action for judicial review.  *See* docket no. 1.  A briefing schedule was entered on January 3, 2022.  *See* docket no. 11.  On April 4, 2022, Snyder filed the Plaintiff's Brief ("Snyder's Brief") (docket no. 14).  On July 5, 2022, the Commissioner filed the Defendant's Brief ("Commissioner's Brief") (docket no. 19).  On July 15, 2022, Snyder filed the Reply Brief (docket no. 20).  Additionally, on March 15, 2022, the parties filed the Joint Statement of Facts (docket no. 13).

## III.  ALJ's FINDINGS

The ALJ determined that Snyder was not entitled to disability insurance benefits because he was functionally capable of performing work available in the general economy.  R at 1369.    In making this determination, the ALJ followed the five-step sequential process required by the social security regulations for assessing whether a claimant is under a disability.  *See* 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Swink v. Saul*, 931 F.3d 765, 769 (8th Cir. 2019); *Moore v. Colvin*, 769 F.3d 987, 988 (8th Cir. 2014). The five steps an ALJ must consider are 1) whether the claimant is currently employed; (2) whether the claimant is severely impaired; (3) whether the impairment is or approximates an impairment listed in Appendix 1; (4) whether the claimant can perform past relevant work; and, if not, (5) whether the claimant can perform any other kind of work.  *Id.*; *see also* 20 C.F.R. § 404.1520(a)(4)(i)-(v).  "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled."  *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006).

In considering the steps in the five-step process, the ALJ:

first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (quoting *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009)). If the claimant is unable to return to his relevant past work, then, at step five, the burden shifts to the Commissioner to demonstrate that "the claimant has the physical residual functional capacity [("RFC")] to perform a significant number of other jobs in the national economy that are consistent with [his or] her impairments and vocational factors such as age, education, and work experience." *Phillips v. Astrue*, 671 F.3d 699, 702 (8th Cir. 2012) (quoting *Holley v. Massanari*, 253 F.3d 1088, 1093 (8th Cir. 2001)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. *See* 20 C.F.R. § 404.1545(a); *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014). The ALJ bears the responsibility for determining "a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his or] her limitations." *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)); *see also* 20 C.F.R. § 404.1545.

In the case at bar, the ALJ determined that Snyder met the insured status requirements through December 31, 2021. R at 1355. The ALJ then applied the first

step of the analysis and determined that Snyder had not engaged in substantial gainful activity from his alleged onset date of May 16, 2014. *Id*. At the second step, the ALJ concluded from the medical evidence that, through the date last insured, Snyder had the following severe impairments: status-post rectal cancer; obstructive sleep apnea; sleep disorder; coronary artery disease; mild cognitive impairment; attention deficit hyperactivity disorder ("ADHD"); and anxiety. R at 1356. At the third step, the ALJ found that, through the date last insured, Snyder did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. R at 1356-1358. At the fourth step, the ALJ determined that, through the date last insured, Snyder had the capacity to perform less than the full range of light work, specifically finding:

> [Plaintiff] can push and pull as much as can lift and carry; occasional exposure to extreme heat or extreme cold; must avoid hazards such as unprotected heights or dangerous machinery; no operation of a motor vehicle to carry out job duties; simple, routine tasks; simple instructions at an SVP 2 level; no fast paced production work; no tandem tasks, meaning it would not be necessary to interact with coworkers to carry out job tasks; frequent contact with supervisors, coworkers and the public; but no customer service work.

R at 1358. Also at the fourth step, the ALJ determined that, through the date last insured, Snyder was not able to perform his past relevant work as a Help Desk Representative. R at 1368. At the fifth step, the ALJ determined that Snyder was capable of performing jobs available in the national economy as a cleaner, marker and bagger. R at 1369. Therefore, the ALJ concluded that Snyder was not disabled. *Id*.

## IV. STANDARD OF REVIEW

The Commissioner's final determination not to award disability insurance benefits is subject to judicial review. *See* 42 U.S.C. § 405(g). The court has the power to "enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." *Id*. The Commissioner's factual findings shall be conclusive "if supported by substantial evidence." *Id*. An ALJ's

decision must be affirmed "if it is supported by substantial evidence in the record as a whole." *Grindley v. Kijakazi*, 9 F.4th 622, 627 (8th Cir. 2021) (quoting *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996)). "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.'" *Kraus v. Saul*, 988 F.3d 1019, 1024 (8th Cir. 2021) (quoting *Phillips*, 671 F.3d at 702).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the [administrative law judge ("ALJ")], but [it] do[es] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers "both evidence that detracts from the Commissioner's decision, as well as evidence that supports it." *Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (providing that review of the Commissioner's decision "extends beyond examining the record to find substantial evidence in support of the [Commissioner's] decision" and noting that the court must also "consider evidence in the record that fairly detracts from that decision"). The Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is "something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal."

*Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991)). A court "will disturb the ALJ's decision only if it falls outside the available zone of choice." *Kraus*, 988 F.3d at 1024 (quoting *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006)). "An ALJ's decision is 'not outside the zone of choice' simply because [the c]ourt 'might have reached a different conclusion had [it] been the initial finder of fact.'" *Kraus*, 988 F.3d at 1024 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). Therefore, "even if inconsistent conclusions may be drawn from the evidence, the [Commissioner's] decision will be

6

upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *see also Igo v. Colvin*, 839 F.3d 724, 728 (8th Cir. 2016) (providing that a court "may not reverse simply because [it] would have reached a different conclusion than the [Commissioner] or because substantial evidence supports a contrary conclusion").

## IV. RELEVANT FACTUAL BACKGROUND

As noted above, on March 15, 2022, the parties filed the Joint Statement of Facts (docket no. 13), which addresses Snyder's background, the case's procedural history, testimony from the administrative hearings and Snyder's medical history. The Joint Statement of Facts is hereby incorporated by reference. Further discussion of pertinent facts will be addressed, as necessary, in the court's consideration of the legal issues presented.

Snyder was born in 1968. R at 200. He completed two years of college in 2015. R at 236. In the past he has worked as a help desk analyst and a technical solutions analyst. *Id.*

On February 11, 2021, this case was remanded by the court. In the Report and Recommendation recommending remand, Judge Roberts thoroughly considered the ALJ's consideration of the opinions of opinions of state agency consultants, Dr. Westra and Dr. Lark. Judge Roberts quoted the following opinion provided by Dr. Westra:

> [Activities of daily living] are full range and intact. He drives, uses a computer, handles finances, and takes college coursework. He has difficulty with rapidly presented information or too many inputs at once. He can pay attention for an hour if no distractions. Concentration is difficult under stress. Third party is consistent. Evidence is consistent. Claimant is capable of a range of detailed tasks but will have difficulty with sustaining attention without getting distracted, sustaining a rapid pace, and working in a high stress environment. Social skills are intact.

R at 1469-1470. Judge Roberts noted that Dr. Lark affirmed Dr. Westra's opinion. R at 1470.

Judge Roberts also noted that:

> The ALJ did not evaluate these opinions or assign them weight in his decision, although he did so with the state agency reviewing medical consultants' opinions, which were included in the same initial and reconsideration denials of benefits. However, the ALJ stated that when crafting Claimant's RFC, he put "special emphasis" on certain exhibits, including Dr. Lark's opinion.

Id.

Additionally, Judge Roberts noted that: "SSA explains that '[r]egardless of its source, we will evaluate every medical opinion we receive.' 20 C.F.R. § 404.1527(c)." R at 1472. Judge Roberts then recommended that the case be remanded and stated:

> Claimant is correct that the ALJ did not explain the weight afforded to Dr. Westra's and Dr. Lark's opinions in his decision. (Doc. 10 at 4.) The ALJ also did not discuss the opinion, which would allow the Court to understand whether the ALJ assigned the opinion much weight or little weight, but only failed to follow the formality of assigning the opinion a specific weight. *See Irvin v. Astrue,* No. 10-0993-CV-W-DGK-SSA, 2011 WL 4067509, at *3 (W.D. Mo. Sept. 13, 2011) ("Here, although the ALJ failed to specifically identify the weight accorded to each physician's opinion, he discussed each opinion at length.").

R at 1473. Judge Roberts recommended that the court affirm the ALJ's consideration of the opinions of treating psychiatrist, Dr. Schroder, and consultative examiner, Dr. Collins. R at 1465, 1469. Additionally, Judge Roberts found that the ALJ's formulated RFC adequately accounted for Snyder's post-rectal cancer bowel and bladder urgency issues. R at 1478. Lastly, Judge Roberts recommended that the ALJ's decision be affirmed with regard to the ALJ's consideration of Snyder's subjective complaints. R at 1484.

8

## V. ANALYSIS

**Issue 1.     Whether the ALJ Complied with the Court's Remand Order in Considering Dr. Westra and Dr. Lark's Opinions**

### a. The Parties' Arguments

Snyder alleges that the ALJ violated the court's remand order because he did not provide good reason for affording little weight to the opinions of state agency consultants Dr. Westra and Dr. Lark.  *See* Snyder' Brief at 3-7.

Snyder specifically argues that the ALJ failed to comply with the "law of the case" in failing to follow the remand order of both this court and the Appeals Council.  *Id*. at 3.  Snyder asserts that the remand order of this court required the ALJ to properly weigh the medical opinions of Dr. West and Dr. Lark and that the court ordered the ALJ to explain the weight given.  *Id*. at 4-5.  Snyder argues that the ALJ failed to do so, and that the RFC the ALJ formulated fails to account for the limitation in sustained attention with which Dr. Westra and Dr. Lark opined Snyder would suffer.  *Id*.  Snyder argues that the ALJ's additional explanation also did not comply with the court's remand order and the law of the case.  *Id*.

The Commissioner counters that Snyder's argument is without merit.  *See* Commissioner's Brief at 5.  Specifically, the Commissioner notes that Judge Roberts recommended that the court remand Snyder's case because ALJ Comisky acknowledged that both Dr. Westra and Dr. Lark issued an opinion, but ALJ Comisky failed to assign weight to those opinions.  *Id*. at 5-6.  Additionally, the Commissioner asserts that on remand ALJ Gordon properly assigned "partial weight" to Dr. Westra and Dr. Lark's opinions and specifically explained the weight which he gave those opinions.  *Id*. at 6-7.  The Commissioner asserted that the ALJ accounted for any limitation in concentration opined by Dr. Westra and Dr. Lark by limiting Snyder to simple work with no fast-paced assembly line duties.  *Id*. at 9

### b. Applicable Law

"The law-of-the-case doctrine generally prevents re-litigation of an issue previously resolved and requires courts to adhere to decisions rendered in earlier proceedings. This doctrine applies to administrative agencies on remand." *Hulsey v. Astrue*, 622 F.3d 917, 924 (8th Cir. 2010). An ALJ must follow any order rendered by the Appeals Council pursuant to 20 C.F.R. § 404.977(b).

"It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001) (noting internal citations omitted). *Galloway v. Kijakazi*, No. 20-CV-00059-CJW, 2021 WL 5278545, at *5 (N.D. Iowa Sept. 2, 2021*), report and recommendation adopted*, No. 20-CV-59-CJW-MAR, 2021 WL 4399719 (N.D. Iowa Sept. 27, 2021), *aff'd*, 46 F.4th 686 (8th Cir. 2022).

The standard for evaluation of medical opinions for claims filed before March 27, 2017, is governed by 20 C.F.R. § 404.1527, while 20 C.F.R. § 404.1520c, governs the standard for evaluation of medical opinions for claims filed on or after that date. Because Snyder filed his claim prior to March 27, 2017, the prior regulations apply. The prior regulation provides that the following factors will be examined to determine the weight to give the opinion: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors. 20 C.F.R. § 404.1527(c)(2).

An ALJ "generally should explain the weight given to opinions … or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning." 20 C.F.R. § 404.1527(f)(2); *see also* SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996) ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion.… [and] … why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other

10

evidence."). *Ryan v. Kijakazi*, No. C20-4014-LTS, 2021 WL 4907182, at *9 (N.D. Iowa Oct. 21, 2021), *aff'd*, No. 21-3509, 2022 WL 3348986 (8th Cir. Aug. 15, 2022).

### c. Application and Discussion

Snyder fails in his argument that the ALJ did not comply with the order of this court or the order of the appeals council. Judge Roberts never made any specific finding as to the weight that should be assigned opinions of Dr. Westra and Dr. Lark. He found only that the ALJ failed to explain what weight he gave the opinions and why. Judge Roberts did not make any finding as to the weight of the opinions. The law of the case doctrine prevents re-litigation of a settled issue, and in the case at bar there was no settled issue relative to these two medical opinions. Instead, Judge Roberts' recommendation was predicated on the finding that the weight the ALJ assigned to the opinions of Dr. Westra and Dr. Lark was decidedly left "unsettled."

Thus, the central question to be answered is whether on remand the ALJ properly assigned weight to those opinions and whether he gave "good" reasons for the weight given.

On remand, the ALJ addressed Dr. Westra and Dr. Lark's opinions:

Beverly Westra, Ph.D., found the claimant had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. The psychologist found the claimant was capable of a range of detailed tasks but would have difficulty with sustaining attention without getting distracted, sustaining a rapid pace, and working in a high stress environment, noting intact social skills (Exhibit 2A, pp. 6, 10-11). On reconsideration, Russell Lark, Ph.D., found the same paragraph B criteria limitations (Exhibit 4A, p. 7). Upon review, Dr. Lark noted there was no new information related to mental/cognitive issues and affirmed the initial level findings and opinions (Exhibit 4A, p. 12). Overall, the undersigned affords these opinions from Dr. Westra and Dr. Lark partial weight.

R at 1367. The ALJ went on to provide the following explanation for the weight given Dr. Westra and Dr. Lark's opinions:

The opinions are consistent with a finding of non-disability in this matter; however, the undersigned has provided additional limitations to account for later medical evidence. More specifically, the psychological consultants noted the claimant's diagnosis of mild cognitive impairment following cancer treatment and starting psychiatric care in 2015 (Exhibit 6F). In March 2016, the consultants reviewed the neuropsychological exam noting difficulty with sustained attention, cognitive speed, and initial verbal learning (Exhibit 9F). Following their review, neurology records noted treatment for sleep disorders and ADHD related symptoms on medications including Nuvigil and Adderall with noted improvement. Of note, the neurologist reported normal physical and mental status exams (Exhibit 38F; 41F). Psychiatric exams noted complaints of memory, concentration, and sleep issues; however, mental status findings were intact without any significant deficits (Exhibit 39F). Similarly, cardiology exams showed normal mental status findings (Exhibit 37F).

*Id.*

Snyder argues that the ALJ erred in stating that he gave partial weight to the state agency consultant's opinions and "imposed greater limitations" but did not account for any limitation in maintaining attention. *See* Snyder's brief at 5.

The court finds Snyder's argument unpersuasive. Notably, the ALJ explained that he imposed additional limitations beyond those imposed by Dr. Westra and Dr. Lark, stating:

In consideration of the claimant's allegations, history of cancer treatment with residual memory issues, sleep disorder, and anxiety/ADHD symptoms, the undersigned has further limited the claimant to simple instructions at an SVP 2 level, no fast-paced work, no tandem tasks, and frequent work with others but no customer service work. Significantly, the claimant's work activity on a part-time basis and daily activities appeared supportive of an ability to perform simple work-related tasks (Exhibit 6E; Hearing Testimony).

R. at 1367. Thus, Dr. Westra and Dr. Lark's opinions that Snyder would have some limitation in maintain concentration while performing complex tasks is not inconsistent with the ALJ's formulated RFC. Contrary to Snyder's argument, the ALJ's RFC did not fail to properly account for the limitations to which Dr. Westra and Dr. Lark opined. The ALJ limited Snyder to jobs which required only simple, unskilled tasks with an SVP

12

of two or less, and with no fast-paced work and no tandem tasks. Work requiring tasks at an SVP level of two or less are defined as unskilled and usually requires rote, repetitive work with little requirement for attention and concentration.

Moreover, the ALJ was not obliged to adopt all of the limitations to which Dr. Westra and Dr. Lark opined. As noted earlier, the remand order gave no directive that the ALJ was to adopt any portion of the opinions, but rather to assign weight to them and explain the reason for the weight given. The court finds that the ALJ explained that he assigned partial weight for the opinions in question and gave detailed reasoning as to why he did so and formulated an RFC which was consistent with the weight assigned them. Accordingly, the court declines to remand as to this issue.

**Issue 2.**      ***Whether the ALJ Properly Considered Snyder's Subjective Complaints***

### a. Parties' Arguments

Snyder argues that the ALJ did not sufficiently explain why he determined that Snyder was not credibly reporting his limitations. Snyder's Brief at 9. Specifically, Snyder argued that his allegations were consistent with the contemporaneous reports of his treating psychiatrist. *Id*.

The Commissioner asserts that the ALJ properly considered Snyder's subjective complaints. Commissioner's Brief at 14. The Commissioner first noted that the ALJ stated that he considered the consistency of Snyder's allegations with the record as a whole. *Id*. at 15. The Commissioner further argues that the ALJ properly reasoned that Snyder's mental status examinations and examination findings were essentially normal and that Snyder's activities of daily living were inconsistent with Snyder's testimony. *Id*. at 17-18.

### b. Applicable Law

It is the claimant's burden to prove his or her functional limitations, not the ALJ's burden to prove the claimant's functional capabilities. *See Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003) (citing *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)); *accord Charles v. Barnhart*, 375 F.3d 777, 782 (8th Cir. 2004). *See*, *e.g.*, *Qualls v. Apfel* 158 F.3d 425, 428 (8th Cir. 1998) (finding doing crafts, raising flowers, driving, cooking, cleaning, doing laundry, and shopping are activities consistent with light work).

The assessment of a claimant's credibility is a factor used in the determination of a claimant's residual functional capacity to perform work. An ALJ must consider the following factors when evaluating a claimant's credibility: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. *Buckner v. Astrue,* 646 F.3d 549, 558 (8th Cir. 2011) (otherwise known as the *Polaski* factors from *Polaski v. Heckler,* 739 F.2d 1320, 1321–22 (8th Cir. 1984)).

The "credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Moore v. Astrue,* 572 F.3d 520, 524 (8th Cir. 2009). Consequently, courts should defer to the ALJ's credibility finding when the ALJ explicitly discredits a claimant's testimony and gives good reason to do so. *Buckner,* 646 F.3d at 558. Although an ALJ need not explicitly discuss each *Polaski* factor in his or her decision, he or she must at least acknowledge and consider the factors. *See Renstrom v. Astrue,* 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each *Polaski* consideration, so long as he acknowledged and examined those considerations before discounting a claimant's subjective complaints"). Thus, while the ALJ may not simply reject a claimant's testimony out of hand, the ALJ is not obliged to

simply accept testimony as credible without consideration as to the consistency of that testimony with the record as a whole.

### c. *Application and Discussion*

Snyder notes that the ALJ's finding regarding the credibility of Snyder's testimony is located in the decision after the ALJ's analysis of the record as a whole but prior to the ALJ's analysis of the specific opinions of the state agency consultants which he was directed in the remand order to assign weight and explain the weight given. While Snyder asserts that the structure of the ALJ's opinion is "unusual" he fails to articulate any manner in which he was prejudiced by that structure. Snyder's brief at 8.

Snyder concedes that the ALJ articulated the *Polaski* factors. *Id*. Snyder goes on to quote the ALJ's analysis in which he articulated his reasoning for the weight given Snyder's testimony:

> The allegations with respect to the intensity, persistence, and limiting effects of the claimant's impairments are not entirely consistent with, or supported by the evidence as a whole. With regard to the claimant's physical impairments, the record demonstrates that he responded well to treatment of his rectal cancer. He has continued to report some degree of associated bladder and bowel issue with rectal bleeding. However, there has been no indication of any recurrence of the claimant's cancer and none of his providers recommended any work-related restrictions due to his post-cancer symptoms (See Exhibits 38F, pp. 44 and 91; 40F, pp. 4 and 46). With respect to his mental impairment, the record does establish a mild cognitive impairment, anxiety, and treatment for post-chemotherapy ADHD. However, this condition does appear to have improved with treatment. Testing conducted in 2016 showed cognitive improvement compared to testing performed a year earlier. More recent records have continued to demonstrate improvements in the claimant's sleep problems and fatigue, particularly after he started CPAP treatment and ADHD medications (Exhibits 9F; 33F; 37F; 38F; 39F; 41F). Moreover, the claimant's activities of daily living are inconsistent with the degree of limitation alleged. The claimant continues to maintain his own finances and has worked on a part time basis in the period since the alleged onset date. Given all of these factors, the allegations with respect to the limiting effects of the claimant's impairments are not entirely consistent with, or supported by the evidence as a whole.

Snyder's brief at 8-9 (quoting R at 1366). Snyder argues that the ALJ's analysis does not "sufficiently explain why [Snyder] was not credibly reporting limitations." *Id*. at 9. Snyder asserts the ALJ erred because Snyder's testimony that he tired easily and needed extra breaks at work was consistent with contemporaneous reports he made to his psychiatrist regarding his mental fatigue and need to rest while he was working part-time. *Id*. at 9-10. For instance, notes indicated that in November of 2017 Snyder was taking Concerta but still struggling with concentration and focus on some days. *Id*. at 10. Notes from January and April of 2018, indicated however, that when Snyder's dosage of Concerta was increased he was able to concentrate better. *Id*. A year later, in March of 2019, Snyder asked for an increase in Concerta again. *Id*. Eighteen months later, in October of 2020, Snyder reported that he was losing focus in the mid-afternoon. *Id*. at 11.

> Snyder argues further that:

> The record as a whole showed Mr. Snyder could not persist on a fulltime competitive basis without, inter alia, an allowance for a slower pace and breaks as needed due to fatigue and extra naps during most days, if attempting fulltime competitive work, and such limitations just are not consistent with fulltime competitive employment. (*See* TR 1408-11). The ALJ was wrong to point to Mr. Snyder's part-time work as showing Mr. Snyder could perform fulltime competitive work, and absent that erroneous inference, it is not clear the ALJ would have denied Mr. Snyder benefits, so remand is warranted. *See Ford v. Astrue*, 518 F.3d 979, 982-83 (8th Cir. 2008).

Snyder's brief at 11.

The court finds this argument unpersuasive. Snyder's assertion that the ALJ found Snyder capable of full-time employment due to his ability to work part-time during the period at issue is not supported in the record. The ALJ made no such finding. The ALJ found that Snyder's ability to engage in several activities, including his ability to work at a skilled position on a part-time basis, was not consistent with his allegations that he is unable to engage in even unskilled work. The exact language used by the ALJ was that

16

"the claimant's activities of daily living are inconsistent with the degree of limitation alleged." R at 1358.

Snyder also asserts that the ALJ erred in finding him capable of working in a light, unskilled position with an SVP of two or less. *Id.* It is Snyder's burden to show that he is not capable of performing such work. The ALJ articulated that he considered each of the *Polaski* factors and that after considering the record as a whole, he found Snyder's subjective complaints to be less than fully credible.

At various points in the decision the ALJ pointed out inconsistencies between Snyder's alleged impairments and both his daily activities and mental status examination findings. The ALJ noted:

> [P]sychiatric records noted ongoing treatment for insomnia and anxiety disorder treated on BuSpar, Lorazepam as needed, Doxepin, and Melatonin. On exam in September 2018, the claimant reported problems with memory and concentration, anxiety at times, and decreased energy levels. Inconsistent with his allegations, however, records noted the claimant was working through Vocational Rehab doing work at home that did not involve using the phone, since using the phone caused him anxiety. He reported tiredness using his mind, problems following directions at times, and trouble talking on the phone due to anxiety. Clinically, the claimant had intact mood and affect, logical thought processes, intact insight and judgment, okay memory and cognition (Exhibit 39F, p. 9).

*Id.* at 1362-1363.

The ALJ additionally noted that during subsequent examinations the claimant made similar complaints but that his mental status examinations were unremarkable, showing intact cognition, memory, insight, judgment, mood and affect. *Id.* at 1363. The ALJ noted further:

> In May and September 2019, the claimant alleged he was not getting enough hours at work due to getting tired and needing to nap, indicating he could only get four hours per day. Inconsistent with such allegations, the psychiatrist once again noted normal mental status functioning during the evaluation, without indication of tiredness or fatigue. Notably, the exam took place in the afternoon when the claimant alleged symptoms started (*Id.* at 5-6). In January 2020, the claimant alleged taking longer at work,

17

needing notes to remember things, and needing a 30-minute rest after working a few hours; however, mental status findings remained normal.

*Id*. at 1363.

In short, the ALJ articulated a number of reasons for finding that Snyder's subjective complaints were only partially credible. The ALJ referenced the Polaski factors and then discussed them in his analysis, specifically noting Snyder's daily activities, work history, long term treatment, and the effectiveness of medication prescribed. While the record could be interpreted differently, that does not meet the burden to set aside the ALJ's findings. Accordingly, the court declines to remand as to this issue.

### Issue 3. Whether the ALJ Provided Good Reasons for the Weight Afforded Dr. Schroder's Opinions

#### a. The Parties' Arguments

Snyder alleges that the ALJ did not provide good reason for affording treating physician Dr. Schroder's opinion "little weight." Snyder's brief at 14. Specifically, Snyder noted that in a prior brief before this court, he had noted several instances in Dr. Schroder's records in which Dr. Schroder noted "memory and energy findings." *Id*. at 14. In addition to those findings, Snyder notes that in later records on three occasions: May 23, 2019; January 23, 2020; and February 21, 2021, Dr. Schroder stated that "memory decreased some." *Id*. at 15.

The Commissioner counters that the ALJ provided good reason for the weight afforded to Dr. Schroder's opinions. Commissioner's brief at 10. Specifically, the Commissioner notes that Dr. Schroder's opinion was rendered in a checkbox format and provided no elaboration as to the findings. *Id*. at 10-11. The Commissioner further argues that the ALJ found that Dr. Schroder's opinion was inconsistent with the record as a whole despite the fact that Snyder cited several isolated treatment notes which

supported it because the majority of Dr. Schroder's records showed normal mental status. *Id*. at 11.

### b. *Applicable Law*

The court applies the same law as stated in Part V 1(b) of this order. The courts have analyzed 20 C.F.R. § 404.1527, as follows: "The opinion of a treating physician is generally afforded 'controlling weight if that opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" *Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). The ALJ may discount or disregard a treating physician's opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *See Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir. 2008). When an ALJ discounts a treating physician's opinion, he or she "must 'give good reasons' for doing so." *Chesser*, 858 F.3d at 1164 (quoting *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012)). "Good reasons for assigning lesser weight to the opinion of a treating source exist where 'the treating physician's opinions are themselves inconsistent,' *Cruze* [*v. Chater*], 85 F.3d [1320,] 1325 [(8th Cir. 1996)], or where 'other medical assessments are supported by better or more thorough medical evidence,' *Prosch* [*v. Apfel*], 201 F.3d [1010,] 1012 [(8th Cir. 2000)]." *Id.*

SSA guidance provides that the decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers … the reasons [for the decision]." *Titles II & XVI: Giving Controlling Weight to Treating Source Med. Opinions*, SSR 96-2P (S.S.A. July 2, 1996). *See also Lucus v. Saul*, 960 F.3d 1066, 1068 (8th Cir. 2020).

19

A treating physician's statement that is "not supported by diagnoses based on objective evidence" will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003) (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)).

The court also notes that the Eighth Circuit has ruled that it not error for an ALJ to emphasize more consistent "normal" exam results over outlier results. "The ALJ weighed all of the evidence before him and made a permissible decision to give more weight to the "normal" exam results." *Grindley v. Kijakazi*, 9 F.4th 622, 629 (8th Cir. 2021).

### c. Application and Discussion

In his brief Snyder concedes that with regard to the ALJ's assignment of "little weight" to Dr. Schroder's opinions, "[T]his Court found a similar explanation was sufficient in its prior remand order." Snyder's brief at 14. Nevertheless, Snyder raises a similar argument to that made in the prior case, alleging that Dr. Schroder's notes contain instances where Snyder reported decreased concentration. Additionally, Snyder raises his previous assertion that the ALJ erred in determining that Snyder's ability to handle his finances and work on a part-time basis were inconsistent with Dr. Schroder's opinions.

In the prior case, Judge Roberts wrote in his Report and Recommendation that:

> Although Claimant cites treatment notes where Dr. Schroder noted decreased memory and cognition, in a record as large as this one, it is not uncommon that there would be records that both detract from and support the ALJ's decision. . . . However, the ALJ must render his decision based on the record as a whole. *Id.* Here, the majority of Dr. Schroder's treatment notes show Claimant's psychomotor activity, cognition/memory were "ok," his insight and judgment were fair or ok, and his thought processes were logical. (AR at 633, 637-40, 1108-10, 1141-42, 1144, 1158.) Dr. Schroder's most recent notes in the record—dated March, May, and July 2018—documented "better" concentration and memory, which is consistent with the ALJ's conclusion that although Claimant has mild cognitive impairment, it improved with treatment.

R at 1458.

The court notes that in his current filing Snyder recounts three additional treatment notes from Dr. Schroder's file. Specifically, Snyder argues that Dr. Schroder continued to note such issues in several later treatment records. Snyder points to the following treatment notes in support of this assertion:

5/23/19 – Cognition/memory decreased some. (TR 1904).

1/23/20 – Memory decreased some. (TR 1901).

2/15/21 – Memory decreased some. (TR 1899)

Snyder's brief at 15.

The court agrees with the reasoning set forth in the prior decision. It is significant that Dr. Schroder opined Snyder has no useful ability to understand and remember detailed instructions, carry out detailed instructions, or maintain attention for a two-hour segment. R at 1346. Dr. Schroder further opined that Snyder is "seriously limited" in remembering work-like procedures; in setting realistic goals or making plans independently; in working in coordination with others; in completing a normal workweek without interruption from psychologically based symptoms; in performing at a reasonable pace without an unreasonable number of rest periods; in accepting instruction and responding to criticism from supervisors; and in responding to changes in a routine work setting. R at 1347-1348.

The ALJ considered the medical record and noted that the majority of mental status examination findings showed mental functions were largely intact. R at 1357 (citing Exhibit 38F and 39F). Specifically, the ALJ noted that when seen in the afternoon, at times when he reported the greatest level of cognitive impairment, Snyder presented as alert and oriented and with no distress. R at 1364. The ALJ additionally noted that even though Snyder alleged cognitive impairment at his examinations, Dr. Schroder did not note any objective finding of such an impairment. *Id*. The ALJ stated:

> Considerably, mental status findings during all exams were benign in nature and indicated intact functioning (Exhibit 39F, pp. 1-9). Similarly, neurological and other providers noted intact mental status findings during exams (Exhibits 37F; 38F, pp. 23, 27, and 56). As noted above, the

21

claimant underwent neuropsychological testing showing a mild cognitive impairment; however, the psychologist noted the claimant had the capacity to drive, make knowledgeable legal, financial and medical decisions (Exhibit 9F).

*Id.*

The court finds Snyder's argument unpersuasive for three reasons. First, the court finds that the "outlier" mental status findings which Snyder references are not consistent with the level of impairment alleged by Snyder. Even if the court were to consider the medical treatment records cited by Snyder to be entitled to greater weight, those records merely find that Snyder suffered "some" decrease in memory. Snyder's brief at 14-15. A finding of "some" decrease in memory of cognition is not analogous to a finding of "marked" or "serious" impairment. The term is vague, and more likely to indicate a mild or moderate impairment at best. Thus, even if the court were to give Snyder the benefit of the doubt and consider his proffered evidence entitled to greater weight, that evidence does not support his claim.

Secondly, Snyder's argument that the ALJ erred in considering the fact that he was able to work part-time as evidence he could work full-time is flawed. Notably, Snyder mischaracterizes the ALJ's findings regarding his part-time work as a correlation that it allowed him to work full-time. Rather, the ALJ stated that Snyder's ability to work at a skilled job which he stopped working at not due to job performance but to a COVID-19 related shutdown was not consistent with Dr, Schroder's opinions that Snyder had marked limitations. R at 1359. For instance, Dr. Schroder opined that Snyder would have a marked impairment in dealing with a supervisor but no testimony or evidence was offered that Snyder had any difficulty dealing with supervisors despite the fact that he worked consistently until his job was suspended due to COVID-19. Snyder alleges that the ALJ erred in finding that Dr. Schroder relied upon Snyder's subjective complaints and did not offer objective findings, but the court has reviewed the record and finds that the ALJ did not err in that regard. The ALJ correctly pointed out that Dr. Schroder offered little in the way of objective findings to support such an extreme limitation.

22

Lastly, the ALJ considered not only the supportability of Dr. Schroder's opinion with his own treatment records but the consistency of Dr. Schroder's opinion with the findings of other medical providers. Specifically, the ALJ noted that the neurologist and other providers made normal mental status findings during examinations. R at 1364.

The court has reviewed the record as a whole and found that the ALJ adequately explained his reasons for affording Dr. Schroder's opinion little weight. Assuming the court were to find that the ALJ failed to consider the several benign treatment notes Snyder cites, the ALJ explained that the majority of records showed normal mental status findings. At most, Snyder's argument is made up of style, not substance. "[A]n arguable deficiency in opinion writing that had no practical effect on the decision . . . is not a sufficient reason to set aside the ALJ's decision." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (second alteration in original) (quoting *Welsh v. Colvin*, 765 F.3d 926, 929 (8th Cir. 2014)). Even if inconsistent conclusions could be drawn on this issue, the court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. Accordingly, the court shall overrule this objection.

### Issue 4. Whether The ALJ Erred by Not Fully and Fairly Developing the Record
#### a. The Parties' Arguments

Snyder first argues that the ALJ should have obtained an additional medical expert opinion regarding Snyder's fecal incontinence issues and what physical limitations they might impose. Snyder's brief at 17-18. Snyder asserts that because the ALJ gave little weight to Dr. Schroder's opinions he should have sought additional opinion evidence. *Id*. at 18.

The Commissioner counter-argues that the record was sufficient for the ALJ to form the RFC and render a decision. Commissioner's brief at 20. The Commissioner asserts that the record is well-developed at over 1,900 pages and that further development was not necessary. *See id*. at 19-20. The Commissioner argues that at his hearing neither

23

Snyder, nor his attorney requested additional medical evidence, and that Snyder has not shown unfairness or prejudice resulted from a failure to order a consultative examination or further develop the record. *Id*. at 20-21. The Commissioner argues further that the fact that none of Snyder's treating sources restricted his activities as a result of bowel issues does not mean that the record was undeveloped but supports the ALJ's findings. *Id*. at 21-22.

In his reply brief, Snyder additionally alleges that because the state agency opinions were stale the ALJ should have further developed the record. Reply brief at 4-5.

### b. *Applicable Law*

When an ALJ determines that a claimant is not disabled, he or she concludes that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education and work experience. *See Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998). "An ALJ determines a claimant's RFC 'based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations.'" *Koch v. Kijakazi*, 4 F.4th 656, 667 (8th Cir. 2021) (alteration in original) (quoting *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017)). Thus, an ALJ must use "'some medical evidence of the claimant's ability to function in the workplace' in order to make a proper RFC assessment; "[t]he ALJ may not simply draw his [or her] own inferences about [the claimant's] functional ability from medical reports." *Id*. (first and third alterations in original) (quoting *Combs*, 878 F.3d at 646); *see also Steed v. Astrue*, 524 F.3d 872, 875 (8th Cir. 2008) ("Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace.").

Further, an ALJ "has a duty to fully and fairly develop the evidentiary record." *Byes v. Astrue*, 687 F.3d 913, 915-16 (8th Cir. 2012); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding,

24

and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008).

### c. Application and Discussion

In his brief, Snyder offers a cursory argument which spans little more than a page, the majority of which contains boilerplate language referencing court opinions not on point, that the ALJ did not fully develop the record. Snyder's brief at 17-18. Snyder makes two conclusory statements, the first being that "The ALJ stated Mr. Snyder's fecal incontinence issues were accounted for with the RFC, but Mr. Snyder's fecal incontinence issues were not exertional and not accommodated by 'a range of light exertional demands with occasional exposure to temperature extremes, avoidance of hazards, and no operation of a motor vehicle.'" *Id*. at 18.

The court notes that in the ALJ's decision stated that Snyder "alleged needing bathroom breaks throughout the day due to bowel and bladder issues post-cancer. He reported issues with urgency, having accidents 2-6 times daily, and wearing depends." R at 1359. The ALJ went on, however, to find that "the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations." *Id*.

The ALJ went on to give a detailed recitation of Snyder's treatment for rectal cancer, the majority of which was rendered prior to the alleged onset date. Specifically, the ALJ noted:

> In 2013, the claimant presented with complaints of rectal bleeding over the course of the prior year. A colonoscopy and biopsy were performed, and the claimant was diagnosed with rectal adenocarcinoma (Exhibits 1F; 7F). The record also reflects bladder and bowel issues related to the claimant's rectal cancer and treatment for it. Early records on file noted bowel urgency (Exhibit 11F). The claimant underwent a course of chemotherapy and radiation treatment, which he completed in October 2013 (Exhibit 11F,

25

pp. 61-70). On November 25, 2013, the claimant underwent resection of the rectal mass (Exhibit 2F). In January 2014, the claimant was hospitalized for a pelvic abscess. An ileostomy was performed and antibiotics were administered (Exhibit 3F). The claimant was seen in follow up encounters over the course of the next few months and began another course of chemotherapy in June 2014 (Exhibit 11F, pp. 49-51, 79-85). The claimant completed the second course of chemotherapy in December 2014. At that time, he reported generalized weakness and fatigue. He was also treated for mild acute kidney disease related to dehydration (Exhibit 4F). On December 15, 2014, an ileostomy takedown was performed. The procedure was performed without event and the claimant was noted to do well postoperatively (Exhibit 5F). Subsequently, the claimant intermittently reported symptoms of rectal bleeding and constipation. However, repeat colonoscopies and other evaluation showed no indication of recurrent cancer (See, e.g., Exhibits 7F, pp. 34-45; 11F, pp. 6-9; 33F, pp. 53-62).

*Id.* at 1359-1360.

The ALJ went on to recite Snyder's subsequent treatment which included "normal and unremarkable" findings at a 2018 examination; a colonoscopy in 2019 which rendered "unremarkable findings"; and a subsequent colonoscopy with a tissue biopsy indicting "benign" tissue sample. *Id*. at 1360. While the ALJ noted that Snyder complained of fecal incontinence, he stated:

[T]he doctor noted unremarkable clinical, lab, and colonoscopy testing, recommending conservative treatment for symptoms of incontinence including pelvic floor exercises, increased fiber supplementation, and use of anti-diarrheal medication such as Imodium. Of note, no discussion of specific frequency issues was noted with the records indicating only two formed bowel movements daily. In addition, the provider did not suggest any significant issues or limitations due to the claimant's alleged symptoms.

*Id*.

Here, the court cannot credit Snyder's argument, which asks the court to find that the ALJ should have remanded the case for a medical source to consider the exertional limitations caused by Snyder's reported episodes of incontinence. As noted in detail by the ALJ, Snyder's doctor did consider his reports of incontinence and declined to impose further restriction than the conservative limitations imposed. Thus, the record does not

26

reflect that Snyder's medical sources did not address his complaints of fecal incontinence; rather, the record reflects that they considered those complaints and recommended an appropriate treatment regimen. Therefore, Snyder's argument is best described to be that he believes his doctors should have imposed greater restrictions than those they imposed. Such an argument is not the proper basis for a claim that the record is undeveloped.

The court finds that the conclusory argument made by Snyder as to the ALJ's failure to develop the record regarding his mental and cognitive limitations also fails. Snyder has the burden to establish that he "was prejudiced or treated unfairly by how the ALJ did or did not develop the record." *Onstad v. Shalala*, 999 F.3d 1232, 1234 (8th Cir. 1993). Absent unfairness or prejudice, remand is not required. *Id.* (citing *Phelan v. Bowen*, 846 F.2d 478, 481 (8th Cir.1988)). Here, Snyder has pointed to no actual prejudice or in any way indicated that additional development of the record was necessary. Snyder has offered no more than a conclusory statement.

Therefore, having reviewed the entire record, the court finds that the ALJ did not err in failing to schedule a physical or psychological consultative examination. Accordingly, the court declines to remand as to this issue.

### Issue 5. Whether the ALJ that Decided Snyder's Claim was Constitutionally Appointed

#### Whether the ALJ that Decided Snyder's Claim was Properly Appointed by Acting Commissioner Berryhill

##### a. The Parties' Arguments

Snyder argues that the ALJ who adjudicated his case had no authority to do so because he was not properly appointed. *See* Snyder's brief at 18-20. Specifically, Snyder argues that because Nancy Berryhill began serving as Acting Commissioner on January 20, 2017, and her first term as Acting Commissioner expired on November 16, 2017, prior to the nomination of a Commissioner of Social Security she was unable to serve

thereafter because she was appointed subject to the Federal Vacancies Reform Act ("FVRA"). *Id.* at 20-22. Snyder further urges the court to rely upon the district court decision *Brian T. D. v. Kijakazi*, 580 F. Supp. 3d 615 ( D. Minn, 2022), *appeal filed*, No. 22-1601 (8th Cir. Mar. 22, 2022). *Id.* at 19-20.

The Commissioner counter-argues that Berryhill was validly serving as Acting Commissioner when she ratified the appointments of all ALJ's hired by SSA and that the ALJ who rendered the decision in this matter was therefore properly appointed. *See* Commissioner's brief at 23-39. Additionally, the Commissioner argues that the court should not rely upon *Brian T. D.*, because the decision is an "outlier" decision and conflicts with the plain text of the FVRA which indicates an additional period of service may be served upon the nomination of a PAS officer. *Id.* at 26-27.

In her reply brief, Snyder asserts that Brian T.D. is not an outlier. *See* Rely brief at 6.

### b. Applicable Law

Statutory interpretation "begins with the text." *Ross v. Blake*, 578 U.S. 632, 638, (2016). It is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, and common meaning. *Sandifer v. U.S. Steel Corp.,* 571 U.S. 220, 220. (2014). "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985). (citing *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982)).

Courts "ordinarily resist[ ] reading words or elements into a statute that do not appear on its face." *Dean v. United States*, 556 U.S. 568, 572 (2009) (quoting *Bates v. United States*, 522 U.S. 23, 29 (1997)); *see also Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1900 (2019) ("[I]t is our duty to respect not only what Congress wrote but, as importantly, what it didn't write.").

The Eighth Circuit explained that:

[T]his Court looks to canons of statutory interpretation only when the meaning of a statute is ambiguous or would lead to an illogical result that defeats the purpose of the legislation. This Court interprets statutes in a way that is not hyper-technical, but instead, is reasonable and logical and gives meaning to the statute.

*Behlmann v. Century Sur. Co.*, 794 F.3d 960, 963 (8th Cir. 2015).

The first approach to statutory interpretation is the "plain language" of the statute, which is the "one, cardinal cannon before all others." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992). Where the language of the statute is plain, the inquiry ends with the language of the statute. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989).

The second cardinal rule of statutory construction is that when the plain text is ambiguous the intent of the legislative assembly is to be given effect. "[T]he Court interprets statutory provisions—including delegations—by reading the text in "context" and in light of the statutory purpose." *Broadcasting Co. v. United States*, 319 U.S. 190, 214, 216 (1943). *See also Gundy v. United States*, 139 S. Ct. 2116 (2019). But statutes are "contextual as well as textual." *Argosy Ltd. v. Hennigan*, 404 F.2d 14, 20 (5th Cir. 1968). "When interpreting a statute, we must also consider the statutory context in which the words in question appear, including both '"the specific context in which th[e] language is used, and the broader context of the statute as a whole.'" *Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.*, 9 F.4th 803, 807 (8th Cir. 2021), *cert. denied*, No. 21-1217, 2022 WL 2296036 (U.S. June 27, 2022). Where a literal interpretation of a statutory provision would not accord with the intended purpose of the legislation, or produces an absurd result, courts must look beyond the plain words of the statute. *United States v. American Trucking Assns.*, 310 U.S. 534, 543 (1940).

Also, "[g]enerally, in the context of statutory interpretation, a word is known by the company it keeps, which is an interpretive principle called 'noscitur a sociis[.]'" *Designworks Homes, Inc.* 9 F.4th at 803.

29

### c. Application and Discussion

### 1. The FVRA and Factual Background

The Appointments Clause of the U.S. Constitution requires presidentially appointed "Officers of the United States" to receive Senate confirmation, U.S. Const. art. II, § 2, cl. 2. The Clause "distinguishes between two kinds of officers." *Seila Law LLC v. Consumer Fin. Prot. Bur.*, 140 S. Ct. 2183, 2199 n.3 (2020). The first kind are "principal officers," commonly referred to as PAS officers who must be appointed by the President with the advice and consent of the Senate. *Id.* The second class of officers consists of "inferior officers," who can alternatively also be appointed by the President with the advice and consent of the Senate, but "whose appointment Congress may vest in the President, courts, or heads of Departments." *Id.* at 2199 n.3. But where a vacancy arises and "the President and Senate cannot promptly agree on a replacement," the ensuing delay risks that the PAS office remains unfilled, and its official acts go "unperformed." *N.L.R.B. v. SW General, Inc.*, 137 S. Ct. 929, 934, (2017).

In 1998, Congress enacted the Federal Vacancies Reform Act of 1998 (FVRA) Pub.L. 105–277, Div. C, Title I, § 151, Oct. 21, 1998, 112 Stat. 2681–611, 5 U.S.C. § 3301 et seq. Like the earlier Vacancies Act, the FVRA includes a first-assistant default rule[3], but it permits the President to override that rule. 5 U.S.C. § 3345(a)(1).

The FVRA prescribes time limits for those serving in acting positions in 5 U.S.C. § 3346. It provides that:

(a)    Except in the case of a vacancy caused by sickness, the person serving as an acting officer as described under section 3345 may serve in the office—

(1) for no longer than 210 days beginning on the date the vacancy occurs; or

---

[3] The Vacancies Act of July 23, 1868, ch. 227, 15 Stat. 168 (1868), a predecessor to the Federal Vacancies Reform Act (FVRA) which established the basic statutory framework that continues to operate today, created a default rule that in the case of a vacancy "of the head of any executive department of the government, the first or sole assistant thereof shall . . . perform the duties of such head until a successor be appointed, or such absence or sickness shall cease." *Id.* § 1, 15 Stat. at 168.

30

**(2)** subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.

**(b)**

**(1)** If the first nomination for the office is rejected by the Senate, withdrawn, or returned to the President by the Senate, the person may continue to serve as the acting officer for no more than 210 days after the date of such rejection, withdrawal, or return.

**(2)** Notwithstanding paragraph (1), if a second nomination for the office is submitted to the Senate after the rejection, withdrawal, or return of the first nomination, the person serving as the acting officer may continue to serve—

   **(A)** until the second nomination is confirmed; or
   **(B)** for no more than 210 days after the second nomination is rejected, withdrawn, or returned.

*Id*.

For vacancies existing during the first 60 days after a Presidential transition (as occurred in 2017), the 210-day period runs from the later of 90 days after inauguration or 90 days after the date of the vacancy. 5 U.S.C. § 3349a(b).

There is no dispute that the office of Commissioner of Social Security is an office subject to Presidential nomination and Senate Confirmation, otherwise known as a "PAS" position. *See* 42 U.S.C. § 902. Thus, the court will not address that issue. Similarly, the court will not address whether the FVRA was the exclusive means by which Berryhill might have been appointed because neither party argues that Berryhill was appointed by the alternative statutory provision set forth in the Social Security Act. *See* 42 U.S.C. § 902; *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 953 (D. Md. 2020), *appeal dismissed sub nom. Casa De Maryland, Inc. v. Mayorkas*, No. 20-2217 (L), 2021 WL 1923045 (4th Cir. Mar. 23, 2021). Thus, initially, the court finds that Snyder is correct that Berryhill's appointment was subject to the FVRA.

Berryhill assumed the role of Acting Commissioner on January 21, 2017, on the resignation of Acting Commissioner Carolyn Colvin[4], pursuant to the *Memorandum*

---

[4] Colvin became the Acting Commissioner pursuant to the "first assistant rule" as she was confirmed by the Senate on December 22, 2010 for the position of Deputy

*Providing an Order of Succession Within the Social Security Administration*, 81 Fed. Reg. 96337, 2016 WL 7487744 (Dec. 23, 2016) (herein "Succession Memo") issued by President Barack Obama on December 23, 2016. That memorandum provided an order of succession within the SSA that placed the Deputy Commissioner for Operations ("DCO") first in line to serve as Acting Commissioner should the positions of Commissioner and Deputy Commissioner both become vacant.[5] Thus, Berryhill became Acting Commissioner of Social Security on Carolyn Colvin's resignation.

On March 6, 2018, Thomas H. Armstrong, General Counsel for the Government Accounting Office ("GAO"), a non-partisan agency tasked with assuring that the executive branch is operating in compliance with congressional statutes, advised both the SSA and then-President Trump's Administration that Berryhill's term should have ended on November 17, 2017.[6] Following receipt of the GAO's letter, Berryhill stepped down as Acting Commissioner and once again assumed her title of Deputy Commissioner for Operations. On April 2, 2018, she signed an announcement for the federal register under the title "Nancy Berryhill, Deputy Commissioner for Operations, performing the duties

---

Commissioner and was serving in that role on February 13, 2013, when Commissioner Michael Astrue's term in office expired. *See*, Social Security Administration, Social Security Testimony Before Congress, *Testimony of Carolyn Colvin, Acting Commissioner Social Security Administration Regarding Oversight of Federal Disability Programs Before the Oversight and Government Reform Committee U.S. House of Representatives*; https:/ssa.gov/legislation/testimony_061114.html. *See also*, March 6, 2018, GAO letter at 1.

[5] On January 21, 2017, Berryhill was serving as the Deputy Commissioner for Operations. *See*, Social Security Administration, *Social Security History, SSA Commissioners, Nancy A. Berryhill;* https://ssa.gov/history/Berryhill.html.

[6] *See,* Government Accounting Office, *Violation of the Time Limit Imposed by the Federal Vacancies Reform Act of 1998, Commissioner, Social Security Administration;* https://www.gao.gov/assets/700/690502.pdf.

and functions not reserved to the Commissioner."[7]  *See also* Anne Joseph O'Connell, *Actings*, 120 Colum. L. Rev. 613, 634 (2020).  On April 17, 2018, President Trump nominated Andrew Saul for the position of Commissioner of Social Security.[8] After the submission of Saul's nomination on April 17, 2018, Berryhill assumed the title of Acting Commissioner of Social Security for the second time.[9]

On June 21, 2018, the Supreme Court held that ALJs of the Securities and Exchange Commission are inferior "Officers of the United States" within the meaning of the Appointments Clause, and, therefore, the President, a court of law, or department head must appoint them.  *See Lucia*, 138 S. Ct. at 2049.

On July 16, 2018, "[t]o address any Appointments Clause questions involving Social Security claims, and consistent with guidance from the Department of Justice . . . the Acting Commissioner of Social Security [Nancy Berryhill] ratified the appointments of [the Agency's] ALJs and approved those appointments as her own."  Social Security Ruling 19-1p, Titles II and XVI: *Effect of the Decision in Lucia v. Securities and Exchange Commission (SEC) On Cases Pending at the Appeals Council,* 84 Fed. Reg. 9582-02 (Mar. 15, 2019) ("SSR 19-1").

Snyder urges the court to rely upon the district court decision *Brian T.D.* which held that the FVRA lacked a "springback" provision which would allow Berryhill to

---

[7] *Extension of Expiration Dates for Two Body System Listings,* 83 Fed. Reg. 13862 (Apr. 2, 2018).

[8] UPN1849 – *Nomination of Andrew M. Saul for Social Security Administration*, 115th Cong. (2017-2018) 115th Cong. (2019); https://www.congress.gov/nomination/115th-congress/1849?r=9.

[9] On May 14, 2018, Berryhill signed an announcement in the Federal Register as "Nancy Berryhill, Acting Commissioner of Social Security."  *See*, *Rescission of Social Security Ruling 05-02; Titles II and XVI: Determination of Substantial Gainful Activity if Substantial Work Activity Is Discontinued or Reduced-Unsuccessful Work Attempt*. 83 Fed. Reg. 22308 (May 14, 2018).

33

resume service upon the nomination of Andrew Saul as Commissioner of Social Security. Snyder's brief at *Id*. at 19-20.

The Commissioner counter-argues that the *Brian T.D.* decision is an outlier which conflicts with the plain language of the FVRA. See Commissioner's brief at 26-27. Specifically, the Commissioner argues that 5 U.S.C. § 3346(a) provides a single trigger for service as an acting officer during the pendency of a first or second nomination. *Id*. at 28-29.

> 2. ***The Plain Language of 5 U.S.C. § 3346 and its Legislative History Support the Interpretation That a Springback Provision Enabled Berryhill's Second Term as Acting Commissioner***.

This district has rejected the interpretation set forth in *Brian T.D.*. *See Bauer v. Kijakazi*, No. 21-CV-2008-KEM, 2022 WL 2918917 (N.D. Iowa July 25, 2022); *Neith v. Kijakazi*, No. 21-cv-2044-LRR-MAR.

In *Brian T.D.*, the district court similarly placed a significant emphasis on the word "serving" in its present tense. The district court reasoned:

> Courts have frequently looked to Congress' choice of verb tense to interpret statutes. *Carr v. U.S.*, 560 U.S. 438, 447 (2010). When a Court is determining the meaning of an Act of Congress, the present tense generally does not include the past. *Id*. (citing the Dictionary Act, 1 U.S.C. § 1). Congress, in enacting § 3346, used the present participle "serving," rather than the past or present perfect "served" or "has served." Section 3346(a) applies to "the person serving as an acting officer" under § 3345. By its terms, then, the section applies to the person presently serving in that capacity and not to a person who had previously served as Acting Commissioner.

*Brian T. D. v. Kijakazi*, 2022 WL 179540, at *11.

The court disagrees that the language of 5 U.S.C. § 3346 states an individual must already be serving as acting officer on the date that a nomination is made in order to *continue* to properly serve in that role. Such an interpretation reads additional language into the text of the statute. The court finds that the text present in 5 U.S.C. § 3346

34

cross-references to 5 U.S.C. § 3345 and that it is 5 U.S.C. § 3345 of the FVRA that provides for what individual "may serve." Thus, the language at 5 U.S.C. § 3346 is in the present tense, not because it serves as a limitation, but because it relates to the individual next designated to serve pursuant to the applicable section, Section 3345 of the FVRA. Moreover, the actual text of the statute does not mention any requirement that a nomination be submitted within the initial 210-day period. The statute simply says that "*once* a first or second nomination . . . is submitted," the acting official designated under the FVRA may serve "for the period that the nomination is pending." 5 U.S.C. § 3346 (emphasis added).

The court is not alone in its rejection of the statutory interpretation in *Brian T.D.* As noted, four districts have issued similar rulings. In the Middle District of North Carolina, a district court noted "[c]omparison of the language of subsection (b)(1) with that of subsection (b)(2), however, makes clear that the word "serving" does not possess the talismanic significance the *Brian T.D.* court would like to assign it." *Brooks v. Kijakazi*, No. 1:21CV609, 2022 WL 2834345 at *18 (M.D.N.C. July 20, 2022). In that decision, the district court found that the decision in *Brian T.D.* glossed over the fact that interpreting the time limits of 5 U.S.C. § 3346(a)(1) to apply only those who had already served would render a nonsensical result, as it would make it impossible for anyone to serve. *Id*. at 18.

In *Bauer v. Kijakazi*, No. 21-CV-2008-KEM, 2022 WL 2918917 (N.D. Iowa July 25, 2022) this district joined with the *Brooks* decision in declining to follow the statutory interpretation of *Brian T.D* that 5 U.S.C. § 3346(a) applied only to an individual already serving. In *Bauer*, the district court reasoned, as had *Brooks*, 2022 WL 2834345, that the court in *Brian T.D*. erred in its interpretation of the word "serving." The court reasoned in *Bauer*:

> Subsection (a) refers to "the person serving as an acting officer as described under section 3345." Thus, "serving" is used to refer back to section 3345, which sets out who may serve as an acting officer (first assistants or certain other people directed by the President). While § 3345 provides who may

serve as an acting officer, § 3346 sets the periods of time during which such persons may serve in that role. Significantly, the active verb in § 3346(a) is not serving, but "may serve": "the person . . . may serve" subject to the time limits set out in subsections (a)(1) and (a)(2). By using "may serve," Congress did not convey that the person had to be currently serving for the nomination rule in subsection (a)(2) to apply ("the person . . . may serve . . once a . . . nomination . . . is submitted . . . from the date of such nomination for the period that the nomination is pending").

*Bauer v. Kijakazi*, No. 21-CV-2008-KEM, 2022 WL 2918917, at *5 (N.D. Iowa July 25, 2022).

Recently, in the Eastern District of Virginia, the district court similarly declined to follow the interpretation of *Brian T.D.*, stating:

*Brian T.D.* misreads the import of section 3346(a)'s prefatory language. The Magistrate Judge placed great weight on the present participle "serving," finding that "the section applies to the person presently serving in that capacity and not to the person who had previously served as Acting Commissioner." *Brian T.D.*, 2022 WL 179540, at * 11. But the word "presently" does not appear in the full provision, which refers to "the person serving as an acting officer <u>as described under section 3345</u> . . . ." 5 U.S.C. § 3346(a) (emphasis added). A court "should give effect … to every word that Congress has used in a statute." *Conn. Dept. of Income Maint. v. Heckler*, 471 U.S. 524, 530 n.15 (1985) (citing *Reiter*, 442 U.S. at 339). When this qualifying clause is properly considered, the prefatory language has nothing to do with a period of "present service." Instead, it constrains section 3346(a)'s scope to individuals whose authority stems from the FVRA.

*Lance M. v. Kijakazi*, No. 2:21-CV-628, 2022 WL 3009122, at *13 (E.D. Va. July 13, 2022), *report and recommendation adopted,* No. 2:21CV628, 2022 WL 3007588 (E.D. Va. July 28, 2022).

The court finds the interpretation herein is further supported by the language at 5 U.S.C. § 3346(b). At 5 U.S.C. § 3346(a)(2) there is no language indicating that an individual serving might "continue" service, nor is there a cross reference to 5 U.S.C. § 3346 (b)(1) or (B)(2) regarding such. There is no stated or implied limitation on service to one already holding office as an acting officer. In contrast, 5 U.S.C. § 3346 (b)(1)

36

states that if a nomination is rejected, withdrawn, or returned, "the person may *continue to serve* as the acting officer for no more than 210 days." 5 U.S.C. § 3346(b)(1) (emphasis added). Subsection (b)(2) also states that if a second nomination is unsuccessful, "the person *serving* as the acting officer may *continue to serve*." 5 U.S.C. § 3346(b)(2).

To interpret 5 U.S.C. § 3346(a)(2) as Snyder suggests is appropriate would be to find that Section 3346(a)(2) provides that no person may serve pursuant to the submission of a nomination unless they were "continuing service." The court agrees with *Bauer*, that the language "continue to serve" at Subsection (b)(1) and (b)(2) reinforces the conclusion that the interpretation in *Brian T.D.* is flawed. *See Bauer,* 2022 WL 2918917 at *6. The language of 5 U.S.C. §§ 3346(b)(1) and 3346(b)(2) is specific that if a nomination fails, the person currently serving as acting officer "may continue to serve." The language at 5 U.S.C. §§ 3346(b)(1) and 3346(b)(2) is specific, deliberate, and unambiguous, and makes clear that it restricts office to one already serving. In stark contrast, 5 U.S.C. § 3346(a)(2) contains no such language and at no point indicates that such service is deemed a "continuing" service.

If the court were to interpret 5 U.S.C. §§ 3346(a)(2) as Snyder requests, doing so would not only add language to the text but would compound that error by including language which, in this context, appears to have been intentionally omitted. The court declines to do so.

### ii. The plain language of the Act does not support a conclusion that the word "or" at 5 U.S.C. § 3346(a) serves as a disjunctive which renders an individual not already serving as acting officer to assume office on submission of a nomination to the Senate ineligible to do so.

In *Brian T.D.,* the district court further based its interpretation that 5 U.S.C. § 3346(a) precluded Berryhill from assuming a second term in office upon the submission of Andrew Saul's nomination on the following analysis of the meaning of the word "or":

The word "or" modifies the entire provision that limits the acting officer to a period "no longer than" 210 days from the date the vacancy arose. Thus, when read with the entirety of subsection (a)(1) "or" serves to suspend that time limitation, not to create an entirely separate and distinct period of service. A person serving as an acting officer may do so "for no longer than 210 days beginning on the date the vacancy occurs; or . . . once a first or second nomination for the office is submitted to the Senate," during the pendency of that nomination. *Id.* § 3346(a) (emphasis added). The ordinary usage of the word "or" is disjunctive, indicating an alternative. *United States v. Smith*, 35 F.3d 344, 346 (8th Cir. 1994).

*Brian T.D.* 580 F. Supp. 3d 615.

The court finds that the decision in *Brian T.D.* errs in its interpretation of the word "or" at 5 U.S.C. § 3346(a) as finding the two alternatives mutually exclusive. The FVRA provides:

**(a)** Except in the case of a vacancy caused by sickness, the person serving as an acting officer as described under section 3345 may serve in the office—

**(1)** for no longer than 210 days beginning on the date the vacancy occurs; *or*

**(2)** subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.

5 U.S.C. § 3346 (emphasis added).

The court also finds that the district court in *Brian T.D.* erred in its reliance on *Smith*. *Smith* is easily distinguished from *Brian T.D.* and the case at bar. In *Smith*, the Eighth Circuit considered the language of a statute which barred prosecution for perjury unless "the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed." *Id.* at 346. The Eighth Circuit ruled that it was error to require an individual to prove both factors and that the word "or" in that context indicated that the two factors were alternatives but not that they were mutually exclusive. *Id.* Specifically, the Eighth Circuit ruled that Smith should prevail if he proved the existence of either factor. *Id.*

38

The *Brian T.D.* court erred in relying on *Smith* to support its interpretation that the word "or" was exclusive rather than inclusive. But the Eighth Circuit in Smith found merely that the word "or" was disjunctive. The plain language of the word "or" is defined by Miriam Webster Dictionary as that of a conjunction, "used as a function word to indicate an alternative."[10] The dictionary further provides that the archaic version of the word is "either." *Id*. Thus, as noted, it is possible for the word to be both inclusive and exclusive.

That the Eighth Circuit found "or" was used as a disjunctive in *Smith* resolved whether a declaration *must* fulfill both factors to allow a prosecution but not whether a declaration *may* satisfy both factors. Smith, 35 F.3d at 346. Whether both factors need apply hinges on whether the word is inclusive or exclusive – not on whether the word is conjunctive or disjunctive. If "or" is inclusive, then both choices may apply, but if it is exclusive only one choice could apply. *Smith* makes no determination whether the word "or" is inclusive or exclusive, as that finding was irrelevant to the issue before the Eighth Circuit. *See id*. Additionally, the court finds that such a determination can only be made on a case-by-case basis, as such meaning would differ depending upon the context in which the word was used.

> Here, the word 'or' appears in a permissive sentence, i.e., 'the person serving as an acting officer as described under section 3345 *may serve* in the office,' 5 U.S.C. § 3346(a) (emphasis added), without qualifiers such as 'either' and 'but not both,' *see id*. Accordingly, the court should interpret the word 'or' in Section 3346(a)(1) in its more common, inclusive sense to permit Berryhill, after serving as Acting Commissioner for 300 days following the vacancy under Section 3346(a)(1), to spring back into that role upon Saul's nomination to the Senate under Section 3346(a)(2). *See N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 939, (2017).

*Brooks v. Kijakazi*, 2022 WL 2834345.

---

[10] Miriam Webster Dictionary (11th ed.). Retrieved from https://www.meriam-webster.com/dictionary/or.

In *Bauer*, this district considered the statute's use of the word "or" contextually, finding that:

> According to *Brian T.D.* and *Richard J.M.*, the Deputy Commissioner's initial 100 days of acting service did not occur under subsection (a)(1), and now the length of service is governed by subsection (a)(2); but if the nomination had occurred on the 211th day of acting service, the time limits in subsection (a)(1) would have already elapsed, and thus, subsection (a)(2) cannot apply. I find this reading incongruous with the statutory text, which sets out when an officer "may serve," not when that service must end. In the example, the better reading is that the Deputy Commissioner served as the Acting Commissioner under subsection (a)(1) during the initial 100 days, and the Deputy Commissioner served as the Acting Commissioner under subsection (a)(2) during the pendency of the nomination. Thus, the statute's use of "or" does not demonstrate that subsections (a)(1) and (a)(2) are mutually exclusive.

*Bauer v. Kijakazi*, 2022 WL 2918917, at *13.

The court finds that the language of 5 U.S.C. § 3346(a) is best interpreted to provide that once a nomination has been made for a permanent PAS officer, the appointment of the individual designated by 5 U.S.C. § 3345 has been triggered regardless of whether there is an acting officer already serving on the date the nomination was submitted.

Despite the court's finding that the plain language of the FVRA supports the statutory interpretation contained herein, in an abundance of caution the court will engage in the additional step of reviewing the legislative history of the FVRA as well, to determine whether it also supports the court's statutory interpretation.

### 3.    *The Second Canon of Statutory Interpretation:  Following the Legislative Intent*

A Senate Report ('the Report") accompanied the bill. The Report stated that if the initial time limitation triggered by the vacancy passed, an alternate period of service would be triggered upon the submission of a nomination. *See* S. REP. 105-250, 14

40

(1998). The Report provided that during the period between expiration of the initial term in office and the submission of nomination the office would remain vacant. *Id.* at 18. Significantly, the proposed language of Section 3346(a)(2) of the FVRA, which accompanied the Report, was identical to the language ultimately adopted and is also identical to the language considered herein. *Id.* at 25. Although legislative intent is determined by interpretation of the text, the intent here was explicitly stated in the Report. As such, the legislative intent was that 5 U.S.C. § 3346(a)(2) would provide an additional period of service upon submission of a nomination even if the initial 210-day term had expired.

The court thereby finds that the legislative history of the Act also supports the statutory interpretation rendered herein. Thus, the court finds that pursuant to 5 U.S.C. § 3346(a)(2), an additional term of service as Acting Commissioner of Social Security was created upon the submission of the nomination of Andrew Saul to that office and that the person designated by the Succession Memorandum to serve pursuant to 5 U.S.C. § 3345 was able to serve as Acting Commissioner.

### 4. *Application of Fact and Law*

Having determined that 5 U.S.C. §§ 3345 and 3346 provided that upon the nomination of Andrew Saul on April 17, 2018, the next individual in order of succession would automatically assume the role of Acting Commissioner unless the president designated another individual to the role, the court must then determine whether Nancy Berryhill was the person next in line of succession.[11] The court finds that because Nancy Berryhill stepped down from her position as Acting Commissioner of Social Security at least on or before April 2, 2018, following the GAO's March 6, 2018, letter, and was

---

[11] No evidence has been introduced nor has any party alleged that at the time Andrew Saul's nomination was submitted to the Senate, then-President Trump appointed another individual to serve as Acting Commissioner of Social Security or made any change to the terms of the Succession Memorandum then in place.

properly serving as the DCO on April 17, 2018 (the date of Andrew Saul's nomination), she was the next person in order of succession pursuant to the Succession Memorandum. Berryhill's second term as Acting Commissioner of Social Security was not in violation of the FVRA and properly commenced on April 17, 2018. Thus, the court finds that Berryhill's July 16, 2018, ratification of ALJ appointments was performed on Berryhill's nineteenth day in office during her second term as Acting Commissioner of Social Security and carried the full force of law. Accordingly, the court will not remand as to this issue.

## V. CONCLUSION

In light of the foregoing, it is hereby **ORDERED**:

(1)     The final decision of the Commissioner of Social Security is **AFFIRMED;**

(2)     The Clerk of the Court is **DIRECTED** to enter judgment accordingly and close this case.

**DATED** this 26th day of September, 2022.

LINDA R. READE, JUDGE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA

42